# Exhibit A

# Asset Purchase Agreement

## ASSET PURCHASE AGREEMENT

This Agreement is made and entered into as of December 14, 2019 by and between Abrams Learning & Information Systems, Inc., a Virginia corporation (referred to herein as "ALIS" or "Seller"), and Gotham Government Services LLC, a Virginia corporation ("Purchaser").

## WITNESSETH:

**WHEREAS**, on March 7, 2019, Seller filed a voluntary petition for relief (the "Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court");

**WHEREAS**, upon the terms and subject to the conditions set forth herein and as authorized under sections 105, 363 and 365 of the Bankruptcy Code, the Seller desires to sell to Purchaser and Purchaser desires to purchase from Seller certain assets of Seller pursuant to this Agreement;

**WHEREAS**, the parties hereto having negotiated this purchase in good faith desire to set forth certain representations, warranties and covenants made by each to the other as an inducement to the consummation of the sale and certain additional agreements related to this sale; and

**NOW, THEREFORE**, in consideration of the execution of this Agreement and the mutual covenants contained herein, it is agreed by and between Seller and Purchaser as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ASSETS

Subject to the terms and conditions herein, at the Closing all the assets of Seller (but in each case specifically excluding the Excluded Assets set forth in Section 1.9) shall be sold by Seller and purchased by Purchaser free and clear on the following terms:

**1.1    Intellectual Property.**  Purchaser shall acquire all the intellectual property of ALIS including without limitation, publications and materials, copyrights, trade secrets, URLs and websites, but specifically excluding the Seller Marks, which shall be licensed to Purchaser under a separate License as set forth in Section 1.6.

**1.2.    Contracts.**  Purchaser shall acquire all rights and entitlement to all contracts held by ALIS (the "Assigned Contracts") and shall have the right to perform and collect on such Assigned Contracts in the name of ALIS in accordance with the License or such other name as may be selected by Purchaser in its sole discretion. The Assigned Contracts do not include any contract specifically listed in Section 1.9 as an Excluded Asset.

1



**1.3    Fixed Assets.**  Purchaser shall acquire the fixed assets owned by ALIS as specifically identified in Exhibit A. Unless otherwise agreed, the fixed assets identified in Exhibit A shall be transferred at Closing free of any encumbrances "AS-IS" and "WHERE-IS". Equipment owned by a third party and leased to ALIS shall not be acquired or assumed by Purchaser absent a specific agreement entered into prior to Closing.

**1.4    Accounts Receivable, Work in Process, and Pending Orders.**  Accounts Receivable, Unbilled Accounts Receivable, and the work in process for the Assigned Contracts, in each case, to the extent relating to work performed on or after the Closing, are included in the assets acquired by Purchaser.

**1.5    Miscellaneous Assets.**  At the Closing, subject to the other provisions of this Agreement, Purchaser shall acquire the following assets of Seller used in the operation of Seller's business (its "Business"): (a) office supplies; (b) training material and reference books; (c) customer lists pertaining to Seller's business, and similar records relating to the operation of the Business; (d) telephone numbers, fax numbers and listings, e-mail addresses (excluding those of Seller's owner that are not related to the Assigned Contracts), computer records and programs (to the extent transferable) and employee manuals related to such computer programs used by Seller in connection with the Business; (e) subject to the License, Seller's websites and all URLs related to the business whether owned by Seller or an affiliate or agent of Seller; (f) subject to Section 1.9 below, all of ALIS emails, correspondence and other communications with its past and present customers;; (g) access codes and login passwords for Seller accounts; (h) to the extent permitted by law, copies of employee records and files pertaining to employees of Seller who are to be employees of Purchaser on or after the Closing Date; and any other assets of Seller not specifically listed, excluding Excluded Assets (such items collectively referred to herein as the "Miscellaneous Assets"). Purchaser agrees to maintain the confidentiality of all employee records acquired pursuant to this Section. Purchaser shall indemnify and hold Seller harmless for any direct damages suffered by Seller to the extent such damages are a violation by Purchaser after Closing of the Federal Trade Commission's (i) Privacy Rule and (ii) Standards for Safeguarding Customers Information with regard to Seller's records and files transferred to Purchaser. Purchaser agrees to maintain Seller's sales and service records for the greater of five (5) years after Closing or as long as required by state or federal law.

**1.6    Goodwill and Intangible Assets.**  Seller's operations and goodwill, (excluding relating to the Seller Marks which are subject to the License below), and all other intangibles associated with the business operations ("Goodwill and Other Intangibles") shall be acquired by Purchaser. Use of the Seller Marks shall be subject to the following license (the "License").

(a)    Effective as of the Closing Date, Seller hereby grants to Purchaser for a period commencing on the Closing Date and ending on the fifth (5th) anniversary of the Closing Date (subject to earlier termination as provided in Section 1.6(d) below or as may be extended by mutual agreement of Seller and Purchaser, the "License Term") an exclusive, non-transferable (except as permitted by Section 4.9), non-sublicensable and royalty-free license to use the names "Abrams Learning & Information Systems, Inc.", "ALIS" and the ALIS simplified logo (*i.e.*, ALIS with the torch) (the "Seller Marks"), in each case, solely to

2

CC
CRA

the extent reasonably required in connection with referencing the Assigned Contracts or the corresponding project teams.

(b)    Purchaser acknowledges that (i) Seller is the owner of the Seller Marks and all goodwill related thereto. If Purchaser acquires any rights in the Seller Marks, by operation of law or otherwise, Purchaser hereby irrevocably assigns such rights to Seller without further action by any of the parties. Purchaser agrees not to dispute or challenge, or assist any person in disputing or challenging, Seller's rights in and to the Seller Marks or the validity of the Seller Marks. Purchaser agrees that it shall not, during the License Term, directly or indirectly (A) take, omit to take, or permit any action which will or may dilute the Seller Marks or tarnish or bring into disrepute the reputation of or goodwill associated with the Seller Marks or Seller, or which will or may invalidate or jeopardize any registration of the Seller Marks; or (B) apply for, or obtain, or assist any person in applying for or obtaining any registration of the Seller Marks, or any trademark, service mark, trade name, or other indicia confusingly similar to the Seller Marks.

(c)    Seller may terminate the license granted pursuant to this License immediately on written notice to Purchaser if: (i) Purchaser breaches any provision of this License and (if such breach is capable of being cured) fails to cure such breach within 14 days of being notified to do so; or (ii) Purchaser challenges Seller's ownership of the Seller Marks or the validity thereof.

(d)    On the expiration or termination of this License for any reason: (i) all rights and licenses granted pursuant to this License cease; and (ii) Purchaser shall cease use of the Seller Marks.

**1.7    Allocation of Purchase Price Separately Negotiated.**  At Closing, a Closing Memorandum shall be jointly prepared by the parties to memorialize the specific purchased assets within each of Sections 1.1 through 1.6 and the specified values thereof. The value of the Assets being acquired pursuant to this Agreement shall be that provided for in Section 1.10.2. Purchaser and Seller shall report said amounts on their federal income tax returns in a manner consistent with this Agreement and this allocation. Neither the Purchaser nor the Seller shall in connection with any tax return, any refund claim, any litigation or investigation or otherwise, take any position with respect to the allocation of the purchase price which is inconsistent with the manner of allocation provided for in this Agreement.

**1.8    Liabilities/Assumed Obligations.**  There are no contracts, leases, or other obligations to be assigned to or assumed by Purchaser, except as provided in Section 8.3 below.

**1.9    Excluded Assets.**  Excluded from this transaction are the following assets (the "Excluded Assets"):

(a)    all of Seller's assets related to CEO, President, Directors, and former CFO property, including office furnishings and computers used by General Abrams not material to the performance or administration of Assigned Contracts or previously performed contracts;

3



(c)    Seller's ARCIC MATOC IDIQ;

(d)    the Seller Marks;

(e)    Accounts Receivable, Unbilled Accounts Receivable, and the work in process, in each case, to the extent relating to work performed prior to the Closing;

(f)    all personal assets of Seller's employees;

(g)    cash and cash equivalents of Seller;

(h)    correspondence, documents, drafts, and handwritten notes of General Abrams not specifically required for contract administration purposes of the Assigned Contracts;

(i)    all (i) attorney-client privilege and attorney work-product protection of Seller as a result of legal counsel representing Seller in connection with the Case and/or the transactions contemplated hereby, (ii) documents subject to the attorney-client privilege or work-product protection described in clause (i) of this paragraph, and (iii) documents maintained by Seller in connection with the Case and/or the transactions contemplated hereby;

(j)    all rights of Seller under this Agreement and any agreements entered into in connection herewith;

(k)    employee files and related benefit records, except for the personnel files for employees hired by Purchaser;

(l)    corporate liability insurance and claims related to activities prior to closing;

(m)    Seller benefit plans (health and 401(k));

(n)    pre-Closing claims against former employees;

(o)    tax refunds related to periods prior to Closing;

(p)    laptops currently assigned to VP of Operations and Director of Personnel; and

(q)    office chairs and artwork.

### 1.10   Payment of Purchase Price.

**1.10.1   Earnest Money.** Contemporaneously with the signing of this Agreement, Purchaser shall deposit the sum of Fifty Thousand Dollars ($50,000.00) as

4



earnest money, with the Court, or as otherwise agreed by the parties ("Escrow Agent"). All interest earned upon this earnest money deposit shall accrue to the benefit of Purchaser. Upon the Closing of this sale, the earnest money shall be delivered to Seller and credited to the purchase price. In the event this sale fails to close due to a breach of this Agreement by Purchaser pursuant to Section 5.1(d) below, the Escrow Agent shall promptly disburse the entire earnest money deposit (less interest accrued) to Seller as liquidated damages. The parties recognize and agree that these liquidated damages do not constitute a penalty, but rather have been arrived at in a good faith effort to estimate damages should a breach occur, as the actual damage amount is not reasonably ascertainable. In the event this sale fails to close for any reason other than a breach by the Purchaser, then the Escrow Agent shall promptly refund the entire earnest money plus accrued interest to Purchaser.

**1.10.2 Purchase Price.** The purchase price (as set forth herein, the "Purchase Price") shall be Two Hundred Thousand Dollars ($200,000), paid in cash. The Purchase Price shall be paid by bank wire transfer to the Seller at Closing.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF SELLER

**2.1      Authorization.** Seller is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Virginia and has all requisite corporate power and authority to own, lease and operate its properties and assets, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto. Subject to the entry of the sale order and authorization as required by the Court (a) Seller has the requisite corporate power and authority to execute and deliver this Agreement and the other documents contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder and to consummate the proposed transactions, (b) the execution and delivery by Seller of this Agreement, the performance of its obligations hereunder and the consummation by it of the proposed transactions have been duly authorized by all necessary corporate actions on the part of Seller, (c) this Agreement constitutes, upon the mutual execution and delivery thereof, the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws relating to or affecting creditors generally and by general equity principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**2.2      Conduct of Business Pending Closing.** Seller covenants that during the period beginning on the execution date of this Agreement and ending at Closing or earlier termination of this Agreement in accordance with its terms, and unless otherwise ordered by the Court: (i) Seller shall continue to operate Seller's Business in the usual and ordinary course and in substantial conformity with all applicable laws, ordinances, regulations, rules or orders and will not institute any new, novel or unusual business practices; (ii) Seller shall not allow any liens to be placed against any of the Purchased Assets unless those liens are discharged prior to Closing except court approved lending by Purchaser; (iii) Seller shall not take any action, or fail to take any action, that may cause a material adverse change in the operation of

5



Seller's Business or the value of Seller's intangible assets (iv) Seller shall use commercially reasonable efforts to preserve the value of Seller's Business; (v) Seller shall not hire any new employees (other than a senior instruction systems designer for VBA whose security clearance is pending); (vi) Seller shall preserve the goodwill and business relationships of Seller's Business, including timely payment of all taxes due as of Closing.

    **2.3**   **Seller's Payroll Obligations.**  Seller shall cause to be paid all wages, commissions, 401K, health insurance, child support and wage garnishments, accrued vacation pay and other accrued compensation earned by Seller's employees from the date the Case was commenced to Closing (together with all accrued FICA and withholding taxes) within the time provided by law. At Purchaser's sole discretion, Purchaser may (but shall not be obligated to) offer employment to any or all of Seller's employees who perform work on any of the Assigned Contracts. Seller will remove any non-compete or other obligation that may prevent employees from being hired by Purchaser. Seller shall cause the termination of the employment of all of such employees who will transfer to Purchaser. Employees hired by Purchaser would be new employees and years of service for Seller would not transfer to Purchaser for purposes of determining benefits. In the event Purchaser does not offer employment to any Seller's employees, Seller is solely responsible for all liabilities related to the termination of such employees including but not limited to: (i) any severance payments which may be due; (ii) any accrued but unpaid sick or vacation time; and (iii) any unemployment compensation claims.

    **2.4**   **Good Standing.**   Seller covenants that all existing contracts have been performed in a professional manor and in accordance with the contract. Seller is not aware of actual, pending, or threatened adverse contract actions including but not limited to, termination for default, termination for convenience, stop work order, show cause, defective pricing, overcharges, negative CPAR scores, intent not to renew, or negative client comments. Any claims for overcharges for work performed prior to Closing will be the responsibility of the Seller.

### ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser makes the following representations and warranties to Seller:

    **3.1**   **Authorization.**  Purchaser has the authority to execute this Agreement; and to the extent Purchaser assigns his interest to an affiliated entity, the management of the entity will have approved the transaction and affirmed the Agreement prior to closing. This Agreement and all agreements contemplated hereby are or will be, when executed and delivered by Purchaser, valid, legally enforceable obligations of Purchaser, or his assignee.

    **3.2**   **Accuracy of Representations and Warranties.** No representation or warranty made or to be made by Purchaser in this Agreement will contain any misrepresentation of a material fact or omit to state any material fact necessary to make the statements herein or therein not misleading.



## ARTICLE 4
## COVENANTS

The Purchaser covenants and agrees with the Seller, and the Seller covenants and agrees with the Purchaser, to perform and observe the following covenants:

**4.1** **Cooperation; Further Action.** Each party will fully cooperate with the other party and with the other's employees, agents, attorneys and accountants in connection with any steps required to be taken as part of its obligations under this Agreement. Each party will use its reasonable best efforts to cause all conditions to this Agreement and the transactions described in this Agreement to be satisfied as promptly as possible and to obtain all consents and approvals necessary for the due and punctual performance of this Agreement and for the satisfaction of the conditions herein on its part to be satisfied. No party will undertake any course of action inconsistent with this Agreement or which would make any representations, warranties or agreements made by it in this Agreement untrue or any conditions precedent to this Agreement unable to be satisfied at or prior to the Closing. In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each party to this Agreement shall use its reasonable best efforts to take all such action. In addition, for a period of five (5) years after the Closing Date, Seller and its representatives shall have reasonable access to all of the books and records transferred to Purchaser hereunder, to the extent that such access may reasonably be required by Seller in connection with matters relating to or affected by the operations of the business  prior to the Closing Date, including, without limitation, the preparation of Seller's financial reports or tax returns, any audits, the defense or prosecution of litigation (including arbitration or mediation), and any other reasonable need of Seller to consult such books and records. Such access shall be afforded by Purchaser upon receipt of reasonable advance notice and during normal business hours.

**4.2** **Third Party Consents.** Prior to the Closing, the Seller and Purchaser will endeavor to procure, in writing, all third-party consents and approvals as may be required to consummate the transactions contemplated hereby.

**4.3** **Risk of Loss.** The risk of loss, damage or destruction to any of Seller's assets shall be borne by Seller until Closing.

**4.4** **Purchaser's Access.** Seller shall give to Purchaser reasonable access to the assets being purchased pursuant to this Agreement prior to and on the Closing Date to enable Purchaser to conduct its due diligence review and to make such inspection, as it desires and deems reasonably necessary and without unreasonably interfering with the business operations of Seller. Seller shall maintain said assets until the Closing Date in their present condition.

**4.5** **Expenses.** Except as otherwise provided in Section 5.4 of this Agreement, each party shall pay all expenses (including fees and expenses of legal counsel, accountants or other representatives or consultants) incurred by such party in connection with the transactions contemplated hereby, including without limitation, the negotiation and preparation of this Agreement.

7



**4.6     Taxes.** Any sales, use, excise, and/or transfer taxes (not income taxes) and/or any other duties, charges, fees, levies, penalties, or other assessment imposed by any governmental authority which are due as a result of the sale of assets pursuant to this Agreement shall be timely paid by Purchaser as may be required by law.

**4.7     Court Approval, No Approvals or  Notices Required No Conflicts with Instruments.**     The execution, delivery and performance of this Agreement by the Purchaser, and the consummation of the transaction contemplated hereby and thereby, is subject to entry by the Court of an order approving the sale to Purchaser in form and substance approved by Purchaser in its sole and absolute discretion.

**4.8     Tax Cooperation.** After the date hereof. Seller and Purchaser will cooperate in the preparation of all tax returns and will provide to each other (or cause to be provided) any records and other information reasonably requested, and will provide access to, and the cooperation of, their respective accountants. Seller and Purchaser will cooperate with each other in connection with any tax investigation, audit or other proceeding. Additionally, certain tax obligations of Seller are delinquent and outstanding, and Seller shall use it best efforts to negotiate settlement of such obligations prior to Closing, to be settled at Closing out of the Purchase Price. Cooperation for purposes of this Section 4.8 shall be limited to providing information and does not include incurring legal or accounting fees or staff time in excess of 40 hours.

**4.9     Assignment.**     Purchaser shall have the right to assign its interest in this Agreement and any related documents to an affiliated entity of Purchaser, without the consent of Seller. An assignment by Purchaser of this Agreement to one other than an affiliate requires Seller's consent, which shall not be unreasonably withheld.  In the event of assignment, Purchaser is released from any liability pertaining to this Agreement with the exception of a breach by Purchaser that predates the assignment.

**4.10     Seller access to records.** Purchaser shall provide Seller access to any pre-Closing company records transferred to Purchaser that the Seller needs for its post-Closing activities including government filings, taxes, or litigation.

**4.11     Title to the Assets.** Seller shall deliver to Purchaser the assets being acquired under this Agreement free and clear of all liens and of all rights of redemption.

## ARTICLE 5
## TERMINATION, AMENDMENT AND WAIVER

**5.1     Termination.** Provided that the delay in Closing is not the fault of the party seeking the extension beyond the termination dates set forth herein, in which event the parties agree to extend the herein stated termination date for a reasonable period under the circumstances requiring the extension, this Agreement may be terminated at any time prior to Closing:

        **(a)**     by the mutual consent of the Seller and the Purchaser;

8



**(b)**    by the Purchaser, if any of the conditions provided in Article 7 shall not have been satisfied, complied with or performed as of the time required therefor or before December 31, 2019, whichever occurs first, and the Purchaser shall not have waived such failure of satisfaction, non-compliance or non-performance;

**(c)**    by either the Seller or the Purchaser, if there shall be any law or regulation that makes consummation of the transaction contemplated hereby illegal or otherwise prohibited or if any judgment, injunction, order or decree enjoining the Purchaser or the Seller from consummating such transaction is entered and such judgment, injunction, order or decree shall become final and non-appealable; provided, however, that the Parties seeking to terminate this Agreement pursuant to this subsection (c) shall have used all reasonable efforts to remove such judgment, injunction, order or decree, and provided further that in the event of a bankruptcy filing by or against Seller, Seller shall seek to the extent of its power and rights, the Court approved this Agreement and the closing of it;

**(d)**    by the Seller, in the event of a material breach by the Purchaser of any representation, warranty, covenant or agreement contained herein which has not been cured or is not curable before the Closing;

**(e)**    by the Purchaser, in the event of a material breach by the Seller of any representation, warranty, covenant or agreement contained herein which has not been cured or is not curable before the Closing; or

**(f)**    by either the Seller or the Purchaser, if (i) the Closing shall not have occurred on or before December 31, 2019, or such subsequent date as agreed by the parties in writing or (ii) if the Court approves an Alternate Sale.

**5.2    Amendment.** This Agreement may not be amended except by an instrument in writing signed by the parties hereto.

**5.3    Waiver.** At any time prior to the Closing, any party hereto may (a) extend the time for the performance of any obligation or other act of any other party hereto, (b) waive any inaccuracy in the representations and warranties of any other party hereto contained herein or in any document delivered pursuant hereto, or (c) waive compliance by any other party hereto with any agreement, covenant or condition contained herein. Any such extenuation or waiver shall be valid only if set forth in an instrument in writing signed by the party or parties to be bound thereby.

**5.4    Break-up Fee.** Notwithstanding anything to the contrary contained in this Agreement, in the event the Court approves a sale of all or substantially all the assets of Seller other than to Purchaser ("Alternate Sale"), any such Alternate Sale must be in an amount not less than $50,000.00 more than Purchaser's purchase price as set forth in this Agreement on



account of Purchaser's reasonable costs and expenses for attorneys, accountants, agents and employees, and other costs associated with negotiation, execution, and approval of this Agreement (the "Breakup Fee"). In the event of an Alternate Sale, the Breakup Fee and Post-Filing Advances shall be paid to Purchaser within five (5) calendar days of the closing of an Alternate Sale. Nothing herein shall preclude or prohibit Seller from pursuing, considering, negotiating, or closing an Alternate Sale.

## ARTICLE 6
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller pursuant to this Agreement are, at Seller's option, subject to each of the following conditions, the failure of any of which shall give the Seller the right to rescind this Agreement.

**6.1** **Representations and Warranties of Purchaser.** The representations and warranties of Purchaser contained in this Agreement shall be true on and as of the Closing Date, with the same force and effect as if made on and as of the Closing Date.

**6.2** **Compliance with Covenants.** Purchaser shall have performed all obligations and agreements, and complied with all covenants and conditions contained in this Agreement to be performed or complied with by Purchaser, at or prior to the Closing Date.

**6.3** **Legal Proceedings.** No order of any court or administrative agency shall be in effect which enjoins, restrains, or prohibits consummation of this Agreement, and no litigation, investigation or administrative proceeding shall be pending or threatened which would enjoin, restrain or prevent consummation of this Agreement.

**6.4** **Assumptions.** Seller shall have received the consent of all third parties that are required for Purchaser to assume the executory Assigned Contracts, if any; provided however if consent is not given, Purchaser may elect to assume such Assigned Contract and Purchaser shall indemnify and hold Seller harmless from any claim for direct damages against it which is asserted by the non-consenting party to that contract, which is related to the assignment of said contract without the required approvals. Purchaser would have the right to execute assigned but not novated contracts in the name of Seller. For the avoidance of doubt, Seller shall be entitled to the collection and receipt of all accounts receivable arising from the conduct of the business prior to the close of business on the Closing Date and Purchaser shall be entitled to collection and receipt of all accounts receivable arising from the conduct of the business thereafter.

**6.5** **Approval of Documentation.** The form and substance of all opinions, certificates, instruments and other documents delivered to Seller in connection with this Agreement shall be satisfactory in all reasonable respects to Seller and Seller's counsel.

**6.6** **Court Approval.** The Court in the Case shall have entered an order approving this transaction pursuant to this Agreement. The parties will request that the Court

10

include in the final sale order that the sale of all federal contracts has been completed by operation of law, and thus are exempt from the Anti-Assignment Act.

## ARTICLE 7
## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser pursuant to this Agreement are, at Purchaser's option, subject to each of the following conditions, the failure of any of which shall give the Purchaser the right to rescind this Agreement. In the event of such rescission, any documents executed by Seller as well as any documents provided by Seller to Purchaser with regard to Seller's business shall be returned to Seller:

**7.1    Representations and Warranties.**  The representations and warranties of Seller contained in any section of this Agreement shall be true on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.

**7.2    Compliance with Covenants.**  Seller shall have performed all obligations and agreements, and complied with all covenants and conditions contained in this Agreement to be performed or complied with by Seller, at or prior to the Closing Date.

**7.3    Legal Proceedings.**  No order of any court or administrative agency shall be in effect which enjoins, restrains, or prohibits consummation of this Agreement, and no litigation, investigation or administrative proceeding shall be pending or threatened which would enjoin, restrain or prevent consummation of this Agreement.

**7.4    Assumptions.** Purchaser shall have received the approval of the Bankruptcy Court for the assumption and assignment of the Assigned Contracts pursuant to sections 105, 363, and 365 of the Bankruptcy Code, subject to any applicable non-bankruptcy law.

**7.5    Approval of Documentation.**  The form and substance of all opinions, certificates, instruments and other documents delivered to Purchaser in connection with this Agreement shall be satisfactory in all reasonable respects to Purchaser and Purchaser's counsel.

**7.6    Court Approval**.  The Court shall have issued orders, which shall be in form and substance satisfactory to Purchaser, in its sole and absolute discretion, approving the sale to Purchaser pursuant to this Agreement. Immaterial changes in the form of the order shall not excuse Purchaser's obligations to close.

## ARTICLE 8
## GENERAL

**8.1    Instruments of Transfer.**  The parties agree to transfer all assets, intangibles, and business under this Agreement by bills of sale, assignment or other instruments of transfer and execute all documents as shall be appropriate to effect and carry out the intent and purpose of this Agreement and as shall be sufficient to vest in Purchaser all the title of Seller to the respective assets involved as required by this Agreement.

11

**8.2**   **Survival of Representations.**   Notwithstanding any investigation or examination conducted before or after the Closing or the decision of any party to complete the Closing, each party shall be entitled to rely upon the representations and warranties set forth in this Agreement. Except for the warranty of title to the Purchased Assets and fraud, which shall survive Closing for a period of time equal to the statute of limitations applicable to such claim, all representations and warranties made in this Agreement or in any certificate, exhibit, document, or instrument furnished in connection with this Agreement shall terminate one (1) year after Closing.

**8.3**   **Liabilities.**   Notwithstanding anything to the contrary in this Agreement, the parties hereto expressly agree that Purchaser shall not assume or otherwise become liable for any obligations or liabilities of the Seller, whether known or unknown, asserted or unasserted, accrued or unaccrued, absolute or contingent, liquidated or unliquidated, due or to become due, and whether contractual, statutory, or otherwise, except for obligations relating to the ownership of the assets purchased by Purchaser hereunder arising at any time on or after the Closing. For clarification, the Seller's obligations include without limitation, all liabilities and obligations of Seller under the Assigned Contracts to the extent such liabilities and obligations are required to be satisfied or performed on or after the Closing but arise out of actions or occurrences prior to the Closing Date.

**8.4**   **Binding Nature of Agreement; Assignment.**   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that, except as provided in Section 4.9 of this Agreement, no party may assign or transfer its rights or obligations under this Agreement without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld. Any such assignment shall not in any way release the assignor from its obligations under this Agreement.

**8.5**   **Additional Actions.**   Each of the parties hereto agrees to perform any all acts reasonably necessary to carry out the terms of this Agreement.

**8.6**   **Notices.**   All notices, requests, demands or other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by certified mail, return receipt request, post pre-paid, addressed as follows:

To Seller:

> **Abrams Learning and Information Systems**
> Attn: Elizabeth Bauernshub
> 4270 John Marr Drive, #277
> Annandale, VA 22003
> Telephone:   703-992-5597
> Email:   EBauernshub@alisinc.com

To Purchaser

**Gotham Government Services LLC**
Attn: Christopher Cancialosi
5200 Ellington Court,
Fairfax, VA 22032
Direct Dial: 732.610.7884
chris.cancialosi@gothamculture.com

**with a copy to:**
gothamCulture LLC
Attn: Christopher Cancialosi
25 Broadway, 9th Floor
New York, NY 10004

or such other addresses as any party shall have specified by notice in writing to the other.

     **8.7**   **Interpretation and Applicable Law.** This Agreement has been made and entered into in the Commonwealth of Virginia and shall be interpreted in accordance with the laws of the Commonwealth of Virginia. Unless some other meaning and intent is apparent from the context of the Agreement, the plural shall include the singular and vice versa, and masculine, feminine and neuter words shall be used interchangeably. There are no oral agreements between the parties hereto affecting this Agreement, and this Agreement supersedes and cancels any and all previous negotiations, arrangements, agreements and understandings, if any, between the parties hereto with respect to the subject matter hereof, and none thereof shall be used to interpret or construe this Agreement. There are no other representations or warranties between the parties and all reliance with respect to representations is solely upon the representations and agreements contained in this document. This Agreement shall not be construed either for or against any party, but this Agreement shall be interpreted in accordance with the general tenor of the language in an effort to reach an equitable result.

     **8.8**   **Enforcement.** The parties shall adjudicate any dispute as to the interpretation or enforcement of any part of this Agreement in the Case proceeding.

     **8.9**   **Headings.** The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning and interpretation of this Agreement.

     **8.10**   **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

     **8.11**   **Faxed Documents.** Faxed or emailed documents shall be considered the same as originals; however, the parties agree to use each one's best efforts to secure signatures on the original documents as soon as reasonably possible.



**8.12    No Presumption**. The parties and their counsel have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

## ARTICLE 9
## CLOSING

**9.1    Closing Process.**    The Closing of the transaction contemplated by this Agreement (the "Closing" or the "Closing Date") shall take place at Seller's place of business, within three (3) business days after the last of the contingencies set forth in Articles 7 and 8 of this Agreement has been satisfied or waived (the "Closing Date"), or at such other time and place as is mutually agreed to between the parties. The desired Closing Date is on or before December 31, 2019 and the parties agree that they will use their best efforts to cause the transaction to close as soon as reasonably possible. At the Closing, each of the parties hereto shall deliver all such documents, instruments, certificates and other items as may be required under this Agreement, and each of the agreements executed or delivered pursuant to the terms of this Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the 14th day of December 2019.

**PURCHASER:**                                    **SELLER:**

**Gotham Government Services LLC**                **Abrams Learning & Information Systems, Inc.**

Chris Canciafosi                                 Cecelia R. Abrams, Interim President
                                                 Debtor Designee
                                                 Executor of the Estate of John Abrams

14

## Exhibit A

## Fixed Asset Listing

1. 9 Lenovo ThinkPad laptops

2. 1 Lenovo Yoga laptop

3. 1 Server

4. Cisco Meraki

5. 2 Cisco Routers

6. 2 HP Port Switches

CC
CRA